**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EPROTEC PRESERVATION, INC, | |
| Plaintiff, | Civ. No. 10-5097 (DRD) |
| v. | **O P I N I O N** |
| ENGINEERED MATERIALS, INC, and KEITH DONALDSON, | |
| Defendants. | |

*Appearances by:*

PIEKARSKY & ASSOCIATES, LLC
By:   Scott B. Piekarsky
        Justin J. Walker
191 Godwin Avenue – Suite 9
Wyckoff, New Jersey, 07481

   *Attorneys for Plaintiff*

CONNELL FOLEY LLP
by:   Peter Pizzi, Esq.
        Monica Seth, Esq.
85 Livingston Avenue
Roseland, New Jersey 07068

   *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

This matter concerns the rights to an anti-corrosion technology called "Intercept" and allegations of bad faith conduct in the licensing of that technology. Plaintiff Eprotec Preservation, Inc. ("Eprotec") claims that Defendants Engineered Materials, Inc. ("EMI") and Keith Donaldson mislead it about the properties of the Intercept technology that it licensed from EMI and deliberately interfered in its efforts to raise money on the basis of its exclusive license to the technology. Plaintiff seeks damages under an encyclopedia of theories including: breach of the license agreement; breach of contract; common law fraud; violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et. seq.*; tortuous interference; misappropriation of trade secrets; and breach of fiduciary duty.

Presently before the Court is Defendants' Motion for an order compelling arbitration pursuant to section 4 of the Federal Arbitration Act ("FAA") (9 U.S.C. § 4) and for a stay of the action pursuant to Section 3 of the FAA (9 U.S.C. § 3). Defendants also seek attorney's fees for the costs associated with bringing this motion. For the reasons set forth below, Defendants' Motion is GRANTED with respect to Count One (breach of license agreement), Counts Two and Three (breach of contract), and Count Four (Consumer Fraud). Defendants' Motion is DENIED with respect to the remaining Counts, and with respect to Attorney's fees. What remains of this matter will be STAYED pending the outcome of the currently pending arbitration.

**I. BACKGROUND**

Intercept is a reactive copper polymer developed by John Franey at Bell Labs in 1986.[1] (Def. Ex. J ¶ 8). For many years, Intercept has been marketed as an anti-corrosion product for industrial and consumer use. Id. at ¶ 11. In essence Intercept is a thin film that reacts with and

---

[1] Franey was awarded two patents for the Intercept Technology, one in 1993 and another in 1995. These patents were assigned to Bell Labs.

neutralizes corroding gases in the atmosphere to prevent the tarnish or decay of metals, electronics, optics, plastics, or other products on which it is placed. Id. at ¶ 8.

The rights to the Intercept technology were transferred to Defendant EMI in 1995 pursuant to an agreement with AT&T Corp, then the parent of Bell Labs.[2] Id. at ¶ 10. EMI subsequently registered the trademarks Static Intercept® and Corrosion Intercept® for use in promoting products based on the technology. Id. EMI currently markets the Intercept technology for industrial use via a variety of business partners throughout the world. Id. at ¶ 11.

In 1998 EMI began to supply the Intercept film to Intercept Preservation Products, L.L.C. ("IPP"), a company formed for the purpose of marketing Intercept for use in consumer products. Id. at ¶ 12-13. Initially, EMI owned a substantial portion of IPP, but in 1999, EMI's stake in the company was reduced to 6%. Id. at ¶ 14. In 2002, IPP and EMI signed an agreement (the "2002 Agreement") which gave IPP certain exclusive distribution rights over the sale of Intercept in the consumer market. (Def. Ex. B). This agreement was revised in 2006 (the "2006 Agreement"). (Def. Ex. C).

Under the terms of the 2002 and 2006 Agreements, EMI granted IPP/Eprotec "exclusive rights to the world wide use, manufacture, distribution and sale" of the Intercept technology for consumer market applications, as well as the use of associated trademarks. Id. In addition, each agreement contained a broad arbitration clause. The 2002 Agreement and 2006 Agreement each stated that:

> A. Arbitration. Disputes between or among EMI, and IPP or its designee arising under the provisions of this Agreement shall be submitted to a single arbitrator located within the State of New Jersey, in accordance with the rules of the American Arbitration Association. The award of the arbitrator may, at the election of the prevailing party, be entered as a judgment in the Superior Court of New Jersey. The arbitration of disputes

---

[2] Bell Labs was spun off from AT&T with Lucent Technologies in 1996, and is now a part of the Alcatel-Lucent corporate family.

>shall otherwise be governed by the provisions of N.J.S.A. 2a: 24-1 et seq.
>The administrative fees of the American Arbitration Association and the
>fees of the arbitrator shall be shared equally by the parties to the
>arbitration.

In or about March 2008, Optivest, a Bergen County-based private equity firm, acquired IPP and renamed the company Eprotec Preservation, Inc. (Def. Ex. J ¶ 22). Plaintiff Eprotec claims in its complaint to have merged into IPP. (Complaint ¶ 9).

On September 23, 2008, EMI and Eprotec entered into a new license agreement (the "2008 Agreement"). (Def. Ex. A). The 2008 Agreement is less artfully drafted than the previous agreements[3], but it also grants Eprotec a broad exclusive license to sell and market the Intercept technology and associated intellectual property for use in the consumer industry. Id. The Agreement also provides that:

>This Agreement, and all transactions contemplated hereby, shall be
>governed by, construed and enforced in accordance with the laws of the
>State of New Jersey. THE PARTIES herein waive trial by jury and agree
>to submit to arbitration under the rules of the American Arbitration rules
>in the State of New Jersey and agree to abide by the decision of the
>arbitrator. THE PARTIES agree to reimburse the prevailing party's
>reasonable attorney's fees, and all other expenses, in addition to any other
>relief to which the prevailing party may be entitled. In such event, no
>action shall be entertained by said court of competent jurisdiction if filed
>more than one (1) year subsequent to the date the cause(s) of action
>actually occurred.

From the beginning, the business relationship between IPP and EMI has involved cross-ownership, joint ventures, and overlapping personnel. As stated above, before 1999, EMI owned a significant stake in IPP. (Def. Ex. J ¶ 12, 14). In addition, Defendant Keith Donaldson, the principal of EMI, was a shareholder of Eprotec and served on Eprotec board of directors until September of 2009. Id. at 24, 42. Moreover, on January 12, 2007, EMI and IPP, along with an individual investor, formed Intercept Food & Wine LLC ("IFW"), an entity created for the

---

[3] Eprotec acknowledged at oral argument that the 2008 Agreement was drafted by two of its employees, neither of whom was a lawyer.

purpose of investigating and marketing Intercept technology for use in the food and beverage industry. Id. at 20.

The basic facts of the dispute are heavily contested by the parties, but it is clear that following the absorption of IPP, Eprotec began to contemplate raising capital through a private offering. (Complaint ¶ 18). In order to do so, Eprotec wanted to be able to claim that Intercept had properties that would make it useful in preventing food and beverage spoilage. Id. at 20. In November of 2007 Intercept films had been tested to determine whether they could remove excess chlorides from cork. (Def. Ex. J ¶ 19-21). In March of 2008, Intercept films were further tested to determine whether they had anti-microbial properties, either by themselves, or when coupled with known anti-microbial agents. Id. at ¶ 25. It has since become clear to both parties that either Intercept does not have anti-microbial qualities, or that development of those anti-microbial properties will require vastly more time and expense than originally anticipated. (Complaint ¶ 40).

The relations between Eprotec and Defendants collapsed in mid 2009. The parties each allege significant bad faith conduct against the other. Plaintiff claims, *inter alia*, that EMI and Donaldson lied to it about the anti-microbial properties of the Intercept technology, ignored the exclusivity provisions of the license agreement, refused to supplement the license agreement after promising to do so, and deliberately interfered with its efforts to raise capital via a private placement. (Complaint ¶ 40-44). Defendants claim that IPP/Eprotec extracted its license agreements through deception and threats of violence, breached its duty to diligently market and sell Intercept technology to consumers, improperly folded IFW into its operations, and failed to pay $12,000 due for the cork testing experiments. (Def. Ex. J ¶ 15, 38, 41, 45).

On January 28, 2010, EMI sent a notice to Eprotec purporting to cancel the 2008 Agreement. Id. at 46. On October 4, 2010, Plaintiff filed the instant action. (Doc. No 1). After informing Plaintiff that it believed that the dispute was subject to mandatory arbitration, on December 8, 2010, EMI commenced an arbitration proceeding against Eprotec before the American Arbitration Association ("AAA"). (Pizzi Aff. ¶ 5). On December 13, 2010, AAA acknowledged receipt of EMI's Demand for Arbitration and assigned the arbitration Case No. 18 117 01813 10, *Engineered Materials, Inc. and Eprotec Preservation, LLC* (the "AAA Arbitration"). Id. ¶ 6.

On the basis of these facts, Defendants now move for an order pursuant to 9 U.S.C. §§ 3-4 compelling arbitration and staying or dismissing this proceeding. Defendants also seek attorney's fees for the costs associated with bringing this motion. Plaintiff cross-moves for an order staying arbitration and ordering discovery.

## II.     DISCUSSION

### A.     Standard of Review

"The FAA 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate….'" John Hancock Mut. Life Ins. Co. v. Olick, 151 F. 3d. 132 (3d Cir. 1998), quoting Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 25 n. 32 (1983). The district court is authorized to compel arbitration pursuant to 9 U.S.C. § 4, which states:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

6

In determining whether to order arbitration, "district courts need only 'engage in a limited review to ensure that the dispute is arbitrable–i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.'" John Hancock, 151 F.3d at 137 quoting PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990). If a dispute is subject to a mandatory arbitration clause, a district court must order the parties to arbitration. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") see also John Hancock, 151 F.3d at 136-137. ("Arbitration is, above all, a matter of contract and courts must respect the parties' bargained for method of dispute resolution.").

To determine whether an arbitration clause is binding on the parties to a dispute "[a] federal court must generally look to the relevant state law on the formation of contracts." Blair v. Scott Specialty Gases, 283 F.3d 595 (3d Cir. 2002); *see also* First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (same). "Thus, generally applicable contract defenses may be applied to invalidate arbitration agreements without contravening the FAA." Harris v. Green Tree Fin. Corp., 183 F.3d 173, 179 (3d Cir. 1999). To determine whether a particular claim falls within the scope of an arbitration agreement, the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint. Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, 247 F.3d 44, 55 (3d Cir. 2001) (Citations and internal quotations omitted).

If a party to an arbitration agreement is sued in a federal court on a claim that the plaintiff has agreed to arbitrate, "it is entitled under the FAA to a stay of the court proceeding pending

7

arbitration, Section 3, and to an order compelling arbitration, Section 4. If all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it." Seus v. John Nuveen & Co., 146 F.3d 175, 179 (3d Cir. 1998).

Applying this standard, this Court will examine the language of the arbitration clause and its applicability to each of Plaintiff's causes of action.

### B. Arbitration Clause

As an initial matter, the 2008 Agreement was entered into between Eprotec and EMI. (Def. Ex. A). Defendant Donaldson is not a party to the contract. While Plaintiff's complaint does not trouble to specify which causes of action are directed against each Defendant, at no point does Plaintiff allege that it entered into any contract with Defendant Donaldson. As such, Counts One, Two, and Three, which are predicated on contractual breaches, are not viable against Donaldson and will instead be STAYED with respect to him.[4]

The arbitration clause of the 2008 Agreement states, in pertinent part:

> This Agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of New Jersey. THE PARTIES herein waive trial by jury and agree to submit to arbitration under the rules of the American Arbitration rules in the State of New Jersey and agree to abide by the decision of the arbitrator. THE PARTIES agree to reimburse the prevailing party's reasonable attorney's fees, and all other expenses, in addition to any other relief to which the prevailing party may be entitled. In such event, no action shall be entertained by said court of competent jurisdiction if filed more than one (1) year subsequent to the date the cause(s) of action actually occurred.

---

[4] This court does not here evaluate whether the allegations of the complaint are sufficient to state a claim. While "a court may *sua sponte* raise the issue of the deficiency of a pleading under Rule 12(b)(6) provided that the litigant has the opportunity to address the issue either orally or in writing" in this case, the Plaintiff has not had opportunity to do so. Roman v. Jeffes, 904 F.2d 192, 196 (3d Cir. 1990).

8

On its face, this language is broad, and encompasses all contractual disputes arising out of purported breaches of the 2008 Agreement or any subsequent agreements based upon the technology licensing.

      Plaintiff does not challenge that this contract is a valid and genuine agreement between the parties. Indeed Plaintiff charges that Defendants are liable for breaching its obligations under the Agreement. (Complaint ¶ 47). As such, the only topics for consideration are whether the clause is enforceable and whether the claims brought by Plaintiff fall under the broad scope of this arbitration clause.

      Plaintiff advances several arguments against the application of the arbitration clause. First Plaintiff argues that paragraph 14 "is a choice of law provision and not an arbitration provision." (Pl. Br. 7). It its papers and at oral argument, Plaintiff suggests that the first sentence of paragraph 14—which contains the "and all transactions contemplated hereby" language—should be read apart from the remainder, rendering it incoherent and unenforceable. But selective deletion is not a valid method of contract construction. It is black letter law that all provisions of a contract are to be read together to discern the meaning. Matter of Liquidation of Integrity Ins. Co., 281 N.J. Super 364, 379 (App. Div. 1995) ("The contract is to be considered as a whole, and its provisions are to be read together."); Engelhard Corp. v. N.L.R.B., 437 F.3d 374, 381 (3d Cir. 2006) ("any attempt to read [the] third sentence in isolation renders the first sentence…meaningless and runs contrary to the well established principles of contract construction-to read, if possible, all provisions of a contract together as a harmonious whole."); Oklahoma v. New Mexico, 501 U.S. 221, 246 (1991) ("the ordinary rule of statutory and contract interpretation [requires] that all provisions of a Compact must be read together in a meaningful

9

manner."). Plaintiff cannot simply wish away individual sentences of the arbitration clause because they are inconvenient, particularly if by doing so they render the clause meaningless.[5]

Plaintiff next claims that "the 2008 arbitration provision allowed that AAA is just one forum in which the parties to the 2008 Agreement could elect to submit their disputes." (Pl. Br. 8). This argument is also extremely disingenuous. The language of the 2008 Agreement states that the parties "waive trial by jury and **agree to submit to arbitration** under the rules of the American Arbitration rules in the State of New Jersey and agree to abide by the decision of the arbitrator." (emphasis added). This is the very same language that the New Jersey statutes use to describe a binding arbitration clause. See N.J.S.A. 2A:23B-6 ("**An agreement** contained in a record **to submit to arbitration** any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.") (emphasis added). Moreover, as a matter of common sense, there is no other credible reading of the phrase "agree to submit to arbitration." If the parties retained the ability to sue in any forum that they chose, they would not have "submitted" to anything.[6]

Plaintiff finally argues that the arbitration clause—which Plaintiff drafted— is defective and unenforceable as a matter of New Jersey law. In support of this contention, Plaintiff takes great liberties with a number of inapposite decisions. For example, Plaintiff relies heavily upon Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A., 168 N.J. 124 (2001).

---

[5]  See Restatement (Second) of Contracts § 202 cmt. d ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.").

[6]  See Oxford English Dictionary (1989) ("submit, *v*. To place oneself *under* the control of a person in authority or power; to become subject, surrender oneself, or yield *to* a person or his rule, etc…. "To surrender oneself to judgement, criticism, correction, a condition, treatment, etc.; to consent to undergo or abide by a condition, etc.").

However in Garfinkel, the New Jersey Supreme Court examined whether an arbitration clause which provided that "any controversy or claim arising out of, or relating to, this Agreement or the breach thereof, shall be settled by arbitration" was sufficiently broad to mandate arbitration of a statutory employment discrimination claim. While finding that the general waiver language was "insufficient to constitute a waiver of plaintiff's remedies under the [Law Against Discrimination]" the court did not find the arbitration agreement as a whole unenforceable, and did not rule on the arbitrability of actions based on ordinary breach of contract. Id. at 134. Indeed, the court in Garfinkel assumed that such claims were arbitrable. The Garfinkel decision has little bearing here, where the principal allegations of Plaintiff's complaint are the breach of the very agreement containing the arbitration clause.

Similarly, Plaintiff points to Sarbak v. Citigroup Global Markets, Inc., 354 F.Supp.2d 531, 537 (D.N.J. 2004) for the proposition that to enforce an arbitration clause "there must be an unambiguous writing that clearly establishes that an employee intended to waive the right to sue." However this statement, and the rest of the Sarbak decision, speaks only about the arbitration of employment discrimination claims and other statutory causes of action on the basis of an employment contract of adhesion. This standard is not applied to the arbitration of contractual disputes between arms-length entities. Moreover, even if held to this standard, the language of 2008 Agreement clearly contains unambiguous writing that the parties agree to "submit to arbitration" and "waive trial by jury."

In a curious move, Plaintiff cites to PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10 (1st Cir. 2010) for the proposition that "the parties may call upon the court to determine whether arbitration is mandatory or optional under the contracts which govern their relationship." (Pl. Br. 11). But the holding of Powershare cuts strongly against Plaintiff's arguments. In Powershare,

11

the Court of Appeals for the First Circuit held that an arbitration clause which explicitly permitted the parties "to seek injunctive relief or any other equitable/legal relief or remedies available under law" was nevertheless mandatory and ordered that the parties proceed to arbitration on breach of contract claims. Id. at 12-13. Indeed, Plaintiff has advanced the same argument that was rejected in Powershare; that if injunctive relief is still available—either explicitly or implicitly—that arbitration is not mandatory. This argument was unavailing in Powershare, and it is even less persuasive here, where the contract contains no explicit right to injunctive relief.

Plaintiff also suggests that "a party cannot be forced to arbitrate against its will if the arbitration clause permits, but does not require, arbitration," citing to Summit Packaging Systems, Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12 (1st Cir. 2001). This is doubtlessly true, but even a cursory inspection of the Summit decision illustrates what a genuinely optional arbitration clause looks like. The arbitration clause in Summit provided that disputes "*will be* submitted to arbitration ... or ... to the Courts of the State of New York...." Id. No such "or clause" exists in the 2008 Agreement, nor does any other portion of the Agreement suggest that arbitration is optional or discretionary.

Finally, Plaintiff points to RCM Technologies, Inc. v. Construction Services Associates, Inc., 149 F.Supp.2d 109, 112 (D.N.J. 2001) for the notion that ("a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). While this case has the virtue of actually involving a breach of contract dispute, the arbitration clause at issue in RCM was far narrower than the clause examined here. In contrast to the broad scope of the 2008 Agreement, the RCM clause applied only to "a dispute [that] arises as to interpretation of this Agreement" Id. at 111. The court in RCM rejected arbitration because the contractual breach

complained of did not require any interpretation of the contract. Id. at 114. Here there is no "interpretation" requirement or similar words of limitation that would mandate non-arbitrability.

Plaintiff repeatedly asserts that an enforceable arbitration clause requires both that the parties agree to arbitrate disputes and that they also explicitly waive the right to proceed by any other means. However the very cases that it cites belie this contention. For example, in Angrisani v. Financial Technology Ventures, L.P., 402 N.J. Super 138, 149 (App. Div. 2008) (Pl. Br. 14) the Appellate Division upheld as enforceable an arbitration clause which stated that "[Plaintiff] and [Nexxar] will arbitrate any and all controversies, claims or disputes arising out of or relating to this Agreement or the Executive's employment with the Company ("Claims") before the American Arbitration Association ("AAA") in accordance with the AAA's National Rules for the Resolution of Employment Disputes." This clause is functionally identical to the provision of the 2008 Agreement that Plaintiff would have this Court reject.

Plaintiff's arguments are unavailing and the cases it cites are inapposite. The arbitration clause of the 2008 Agreement is enforceable.

### C.    Contract Claims

Count One of Plaintiff's complaint charges that Defendant EMI has "failed to perform obligations under the License Agreement, including, without limitation, honoring its obligation to provide EP with an exclusive license for the IP for consumer applications of the IP." (Complaint ¶ 46). There can be no question that this claim, for failure to perform the obligations of the 2008 Agreement falls squarely under the reach of said Agreement's arbitration clause.

In contrast, Counts Two and Three of Plaintiff's complaint are vaguely drafted to the point of incoherence, making it impossible to discern with certainty which contracts they seek to enforce. In some places, the Counts appear to seek damages for the breach of additional

contracts, the details of which are not described. See e.g., Complaint ¶ 49 ("In addition to the License Agreement, EP contracted with EMI to receive and have delivered INTERCEPT products that conformed to clear and required specifications so as to allow EP to conduct its business."). In other places, the Counts seem to complain of further breaches of the 2008 Agreement. Id at ¶ 56 ("EMI failed to perform obligations under the License Agreement, including, without limitation, honoring its obligation to provide EP with an exclusive license for the IP"). In still others, there is no way to be sure whether the breaches complained of are breaches of the 2008 Agreement or other unidentified contracts. Id. at ¶ 57 ("EP contracted with EMI to receive and have delivered INTERCEPT products that conformed to clear and required specifications so as to allow EP to conduct its business.").

Under New Jersey law, a complaint alleging breach of contract must, at a minimum, identify the contracts and provisions breached. Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 210 F.Supp.2d 552, 561 (D.N.J. 2002) (party suing for breach must allege "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." ). Failure to allege the specific provisions of contracts breached is grounds for dismissal. Skypala v. Mortgage Electronic Registration Systems, Inc., 655 F.Supp.2d 451, 59 (D.N.J. 2009) (dismissing claim where "the Complaint does not identify the provisions Plaintiff asserts were breached"). As such, given the inadequacies in Plaintiff's complaint, this Court could dismiss Counts Two and Three *sua sponte*.

However, in the interests of judicial economy and the efficient resolution of this dispute, this Court will instead order that Counts Two and Three be arbitrated. The language of the arbitration provision, by its terms, applies to "all transactions contemplated" under the 2008

Agreement. It is unclear whether Plaintiff's claims in Counts Two and Three arise out of the 2008 Agreement itself or out of other "transactions contemplated" by the 2008 Agreement. But in any event the claims are subject to mandatory arbitration.

### D. Consumer Fraud

Plaintiff's fourth claim is for violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et. seq*. In its complaint, Plaintiff alleges that "EMI and Donaldson engaged in unconscionable commercial practices by using proprietary information of EP and manufacturing false pretenses to terminate the License Agreement." (Complaint ¶ 63). Specifically, Plaintiff complains that "Donaldson discovered EP's plans to sell specific consumer goods to the public. He then directly approached third parties with the intent to have such third parties sell similar goods, in direct violation of the License Agreement. Furthermore, Donaldson and his colleague Franey misrepresented the scope of the IP to EP in a manner which impeded its ability to raise funds." Id. at ¶ 64.

To plead a violation of the Consumer Fraud Act, "three elements [are] required for the prima facie proofs: 1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (N.J. 2009). Despite Plaintiff's flimsy contention that this cause of action sounds in an unspecified provision of the New Jersey Consumer Fraud Act, the actual allegations of its complaint are a mere re-exposition of Eprotec's breach of contract and breach of fiduciary duty claims. No citation is made to any specific portion of the statute,[7] and the claims against Donaldson are threadbare at best. Consequently, it appears likely that Plaintiff has failed to provide "a 'short and plain' statement of a claim or defense, the purpose of

---

[7] The New Jersey Consumer Fraud Act N.J.S.A. 58:8-1 – 58:8-195 has over 250 subsections, regulating everything from gift certificates and kosher food to going out of business sales and telemarketing.

which is to place the opposition on notice of the misconduct charged…" Eurand, Inc. v. Mylan Pharmaceuticals, Inc., 266 F.R.D. 79, 83 (D. Del. 2010) quoting Fed. R. Civ. P. 8(a). Plaintiff's consumer fraud claims against Donaldson will be STAYED.

The consumer fraud claims pled against EMI are equally deficient and, in their current form, totally duplicative of Plaintiff's breach of license claims. But in the interests of judicial economy and efficient case management, they will be arbitrated along with the other contract causes of action rather than dismissed outright. Claims under New Jersey's Consumer Fraud Act that arise out of purported breaches of contracts have been held arbitrable. See EPIX Holdings Corp. v. Marsh & McLennan Companies, Inc., 410 N.J. Super. 453, 478 (App. Div. 2009) (consumer fraud claim based on insurance contract ordered arbitrated); Gras v. Associates First Capital Corp., 346 N.J. Super. 42, 52 (App. Div. 2001) (ordering arbitration on consumer fraud claim based on loan agreement). Since Plaintiff's purported consumer fraud claim against EMI is essentially a complaint about contract performance under the 2008 Agreement it is subject to arbitration as well.

### E. Fraud and Misrepresentation

Plaintiff's fraud and misrepresentation claim is similarly confused. First, Plaintiff alleges that Defendant Donaldson represented to it that the Intercept technology had anti-microbial properties,[8] and that those representations were false, ruining Eprotec's efforts to raise money in a private offering.[9] While Plaintiff attempts to paint both Defendants with a broad brush, at no

---

[8] Complaint ¶ 20 ("Donaldson reviewed various drafts of the qualified private offering materials and as such, he had knowledge of the information contained therein. Donaldson represented to EP that INTERCEPT had anti-microbial properties, and further, Donaldson agreed the qualified private offering materials should include specific mention of anti-microbial consumer products which could be made from INTERCEPT").

[9] Id. at ¶ 40. ("Following a July 2009 meeting with Franey, EP was informed the IP does not cover anti-microbial products. When EP approached Donaldson with this newly revealed

point in the complaint does Plaintiff allege any representations made by EMI concerning the anti-microbial properties of Intercept.

Second, Plaintiff claims that "EMI and Donaldson further represented that EMI had the ability and capacity to manufacture and supply materials required under the License Agreement. EMI failed, however, to provide materials which were of the type and standard necessary for the purposes of EP's customers." Complaint ¶ 70. Plaintiff does not specify the substance of the alleged misrepresentations, the types of materials involved, or the standards that the materials failed to meet. As an afterthought, Plaintiff adds that "EMI and Donaldson furthermore provided a false basis for the cancellation of the License Agreement." Id. at ¶ 71.

Under New Jersey law, "a successful claim of fraud requires proof of five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Indian Brand Farms, Inc. v. Novartis Crop Protection Inc., 617 F.3d 207, 218 (3d Cir. 2010) quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582 (1997). Moreover, "[i]n order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of America, 361 F.3d 217, 223-224 (3d Cir. 2004). As a practical matter, "[p]laintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. at 224.

---

fact, Donaldson concurred with his partner Franey, thus directly contradicting earlier statements and representations made by Donaldson to EP.").

In contrast, a negligent misrepresentation claim requires that "(1) defendant negligently made a false communications of material fact; (2) plaintiff justifiably relied upon the misrepresentation; and (3) the reliance resulted in an ascertainable loss or injury." Elias v. Ungar's Food Products, Inc., 252 F.R.D. 233, 251 (D.N.J. 2008).

Held to this standard, Plaintiff's claims of fraud and misrepresentation appear totally inadequate. Plaintiff categorically fails to plead the substance of the alleged misrepresentations and does not remotely suggest the "date, place or time" of the fraud or any other adequate specifics. Nor does Plaintiff elaborate on the alleged damages that it has suffered as a result of EMI's purported misrepresentations. As it is impossible to determine whether these claims arise out of the 2008 Agreement, Plaintiff's fraud and misrepresentation claim against and Donaldson EMI will be STAYED pending the outcome of the arbitration.

### F.     Tortious Interference/Misappropriation/Breach of Fiduciary Duty

Through separately styled causes of action for tortuous interference, misappropriation and breach of fiduciary duty, Plaintiff accuses Defendants of deliberately interfering with its prospective business relationships with Intercept customers. Specifically Plaintiff claims that Donaldson used information that he was entrusted with as a board member of Eprotec to target Eprotec's potential customers on behalf of EMI.[10] Because of this improper interference, Eprotec's potential customers allegedly entered into contractual agreements to acquire Intercept from EMI directly.

While these claims relate to the 2008 License Agreement, they do not arise out of "transactions contemplated" by the agreement and do not fall within the gambit of claims subject

---

[10]     See, e.g., Complaint ¶ 74 -76 ("While Donaldson was a director of EP, he was privy to confidential and proprietary information concerning EP and its business… [A]s a principal of EMI [Donaldson] used such information to… contact[] third parties …[and] secur[e] illicit revenue streams for EMI. As a result… third parties entered into contractual arrangements with EMI for the supply and/or manufacture… of Intercept products…").

to mandatory arbitration. While the relationship between EMI and Eprotec was undoubtedly a factor in Eprotec's decision to put Donaldson on its board of directors, his appointment, conduct, and misappropriation of information on behalf of Eprotec (if any) are matters not contemplated by the contract between the parties. As such, these claims will be STAYED pending the outcome of the arbitration.

### G. Attorney's Fees.

Defendants request an award of attorney's fees for the costs of bringing the instant motion. In support of this request, they essentially advance two arguments. First, Defendants claim that the 2008 Agreement provides that the "prevailing party" shall recover "reasonable attorney's fees, and all other expenses." (Def. Br. 17). Second, Defendants argue that Plaintiff's complaint was "frivolous" given the arbitration clause and that Plaintiff acted in bad faith by refusing to withdraw it once given notice of the clause by Defendants. Id.

This matter is newly filed and no final judgment or preliminary injunctive relief has been granted. While Defendants' motion will be granted—in part—Plaintiff may very well prevail in the arbitration if it is capable of marshalling the facts to support its claims. It is therefore too early to consider an award of attorney's fees on the basis of the "prevailing party" provision of the 2008 Agreement.[11] Moreover, while Plaintiff's complaint contains arbitable causes of action, it also contains claims against EMI and Donaldson that are not subject to the arbitration clause.

---

[11] See e.g., Schmoll v. J.S. Hovnanian & Sons, LLC, 2006 WL 1520751, 11 (Ch. Div. Feb. 9, 2006) ("Fundamentally, a prevailing party is one who achieves a substantial portion of the relief it sought"); see also Tarr v. Ciasulli, 181 N.J. 70, 85 (N.J. 2004) ("a prevailing party is one who succeeds on any significant issue in litigation that achieves some of the benefit the parties sought in bringing suit.").

No credible evidence has been presented that the complaint was filed on the basis of bad faith or dilatory motive. As such, Defendants' request for attorney's fees will be DENIED.

### III.    CONCLUSION

For the reasons set forth above, Defendants' Motion is GRANTED with respect to Count One (breach of license agreement), Counts Two and Three (breach of contract), and Count Four (Consumer Fraud), against EMI. Defendants' Motion is DENIED with respect to the remaining Counts, and with respect to attorney's fees. What remains of this matter will be STAYED pending the outcome of the currently pending arbitration.

                                                s/ Dickinson R. Debevoise
                                                DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: March 9, 2011